## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                )
JOHN LOMBARDI,                                  )
5119 Allison Marshall Drive                     )
Warrenton, VA 20187                             )
                                                )
       Plaintiff,                      )
                                                )    Civil No. 1:13-cv-1542
   v.                                          )
                                                )
THE GEORGE WASHINGTON UNIVERSITY,               )    ECF Case
    Serve:  Office of the General Counsel        )
        The George Washington University       )
        2100 Pennsylvania Avenue NW, Suite 250  )
        Washington DC, 20052                   )
                                                )
       Defendant.                      )
_____)

## COMPLAINT

Plaintiff John Lombardi brings this action against The George Washington University ("GW" or "the University") for monetary relief for injuries sustained as a result of GW's unlawful termination of his employment because he complained about fraudulent practices by GW personnel relating to the University's role as a subcontractor on a federally funded grant program, the Global Anti-Terrorism Training Assistance project.  The prime contractor (SAIC) submitted grant proposals to the federal government, which specifically represented that Mr. Lombardi would the Principal Investigator or technical representative on several task-order contracts to be performed by GW.  GW attempted to engage in a "bait-and-switch" on the prime contractor and the federal government, by replacing Mr. Lombardi as the Principal Investigator on the subcontract without notifying the prime contractor or the government that other, unqualified individuals and not Mr. Lombardi, would actually be performing the task orders. After Mr. Lombardi reported this illegal conduct to high-level officials at GW, GW terminated

Mr. Lombardi's employment in retaliation for his reports, in violation of the False Claims Act, 31 U.S.C. § 3730(h).

## JURISDICTION

1.      This court has federal-question jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. § 3730 *et seq.*

2.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2), as Defendant maintains a place of business in the District of Columbia, and a substantial part of the events giving rise to these claims occurred in this District.

## PARTIES

3.       Plaintiff John Lombardi is a citizen of the Commonwealth of Virginia, who resides at 5119 Allison Marshall Drive, Warrenton, VA 20187.  Mr. Lombardi was engaged by GW as Director of the Center for Preparedness and Resilience ("CPR"), a training and research center within the University devoted to Homeland Security, emergency services and law enforcement issues.  GW terminated his employment in July 2012.

4.      GW is a private non-profit institution of higher education, with its place of business located at 2121 I Street NW, Washington, DC 20052.

## FACTUAL BACKGROUND

### Mr. Lombardi's Employment at GW.

5.       Mr. Lombardi served in the U.S. Army for 28 years, first in the Medical Service Corps., and then as director of Medical Operations for the 332nd Medical Brigade.  He completed his military career in the Pentagon, as Director of Domestic Emergency Preparedness for Medical Programs.  He also served in an advisory role at other government agencies for emergency planning, including as a Department of Defense representative to the Gilmore

National Terrorism Commission.  He reached the rank of Colonel in the U.S. military before he retired.

6.      Mr. Lombardi joined GW's staff in 2007 as Director of Grants and Training in the Office of Homeland Security.  GW tasked Mr. Lombardi with bringing new funding to GW. GW maintains a number of research centers and institutes, which are directed by University professors and other personnel, but which derive their funding primarily from external sources, particularly government contracts and grants and partnerships with private corporations.  From 2007 to 2009, Mr. Lombardi doubled the grants and contract payments to Grants and Training, which flowed to various departments, centers and institutes within the university, including the Medical Center and the Nursing Program.  From 2007 to 2011, he was the Principal Investigator ("PI") on grants and contracts worth approximately $18 million.  Through Fiscal Year 2011, he was often ranked among the top PIs at GW in terms of generating revenue for the University.

7.      GW gave Mr. Lombardi positive evaluations from 2007 to 2011.  He received performance-based salary increases every year from 2008 to 2011, with the final salary increase taking effect on December 25, 2011.

<u>Mr. Lombardi's Role as Principal Investigator on the Global Anti-Terrorism Training Assistance Subcontract.</u>

8.      In 2011 and 2012, Mr. Lombardi served as PI for GW's subcontract with SAIC on the Global Anti-Terrorism Training Assistance project ("GATA"), a subcontract between SAIC, GW and the Department of State.  When proposing the subcontractual relationship to the Office of the Vice President for Research ("OVPR") at GW in 2010, Mr. Lombardi was the PI of record and his certification as to the accuracy of the proposal and future regulatory compliance was made as the PI.

9.      On June 22, 2011, SAIC was awarded the prime contract for GATA, along with the thirteen subcontractors it had identified to the government, including GW.  Based on GW's representations to SAIC, SAIC represented to the government that Mr. Lombardi was to serve as the PI for future task orders to be awarded to GW under the GATA contract.

10.      The contract between SAIC and GW identified Mr. Lombardi as the technical representative at GW responsible for performance of the task orders issued under GATA, consistent with his role at GW as PI.  The contract was based on GW's representations to SAIC, sent to the government, that Mr. Lombardi was going to serve as PI.  GW estimated that the task orders that SAIC intended to assign to GW under the GATA subcontract would generate about $5.0 million over five years.

11.      SAIC initially subcontracted two task orders to GW: an executive training seminar and a program for conferences with partner countries receiving the GATA training materials.

<u>The Funding Scheme for CPR.</u>

12.      A multi-year grant from the Department of Homeland Security and the Federal Emergency Management Administration funded Mr. Lombardi and other staff of GW's Office of Homeland Security's Grants and Training department until the Fall of 2011.  With the conclusion of the multi-year grant, the staff of the Grants and Training Department sought to continue obtaining sponsored projects as the Center for Preparedness and Resilience ("CPR" or "the Center").

13.      In September 2011, the Center applied for and was awaiting the grant of a variety of new sources of funding, including the Global Anti-Terrorism Assistance subcontract with SAIC, worth an estimated $5 million in future task-order projects; two Anti-Terrorism

Awareness seminar programs with the Department of State, each generating roughly $120,000 per event; and a revenue-sharing arrangement with the conference hosting company E.J. Krause & Associates, Inc., worth approximately $100,000.  By the end of 2012, opportunities for the Center to generate new revenue were projected to expand to an additional two dozen projects with SAIC, federal agencies, and outside sponsors.

14.     In July 2011, Daniel Kaniewski, Assistant Vice President for the Office of Homeland Security at GW, told both Mr. Lombardi and Scott Solomon, Senior Assistant Director for Finance and Operations and CPR's financial expert, that with the conclusion of the multi-year DHS and FEMA award on September 30, 2011, that they would require new sources of outside funding for their positions.  He further stated that to provide Grants and Training sufficient time to generate new sponsored programs, the University would fully fund the Center's staff for Fiscal Year 2012 (June 30, 2011 through July 1, 2012) and would provide 60 percent of its funding for Fiscal Year 2013.  Since this funding change required layoffs, Mr. Lombardi and Mr. Solomon were forced to terminate several employees of Grants and Training during the Summer of 2011.

15.     Mr. Kaniewski also stated the new focus of the Center would be business development with a smaller staff.  Mr. Lombardi and Mr. Solomon were to attract new sponsors and create a pool of contracts and awards that would allow the Center to become self-sufficient by the end of Fiscal Year 2013 — a goal that was readily achievable.

<u>The Creation of the Center for Preparedness and Resilience.</u>

16.     In November 2011, Mr. Lombardi submitted a proposal for formally creating the Center for Preparedness and Resilience, which was approved by Dr. Leo Chalupa, the new Vice President for Research at GW, on December 12, 2011.

17.     In December 2011, Dr. Chalupa also announced that GW's Office of Homeland Security would now consist of two distinct entities, CPR, and the Homeland Security Policy Institute ("HSPI").  The charter provided that the Center would exist for at least five years. Rather than keep these entities completely distinct, however, the charter described the Center as reporting to HSPI.  The charter established Mr. Lombardi as the Center's director and his direct superior Frank Ciluffo, the director of HSPI and Associate Vice President for Homeland Security.  Mr. Kaniewski similarly served under Mr. Ciluffo's management as Deputy Director for HSPI and as Assistant Vice President for Homeland Security.  Under the charter approved by Dr. Chalupa, Mr. Lombardi had the responsibility to attract projects the funding for government-backed projects at GW, under Mr. Ciluffo's supervision.

18.     Dr. Chalupa set a fundraising goal of $2.0 million for the Center's first two years, with a deadline of December 2013.  The charter further stated that the Center under Mr. Lombardi's leadership would have 24 months to reach the $2.0 million goal.

19.     In September 2011, Dr. Chalupa also told Mr. Ciluffo and Mr. Kaniewski that these two entities would have to become self-sufficient in the future, and sustain their operations solely through the grant or contract revenue they generated.

20.     At a meeting in October 2011, Mr. Kaniewski suddenly reversed this arrangement and stated that he would be evaluating the Center's financial contributions to the University on a week-to-week basis in consultation with the OVPR.  Dr. Chalupa never approved this change.

### Mr. Kaniewski Misled the Government, SAIC, and GW Staff and Put Himself in Place of Mr. Lombardi as Principal Investigator on GATA.

21.     Once GW issued the charter to the Center in December 2011, Mr. Kaniewski stated that Mr. Solomon, Senior Assistant Director for Finance and Operations and the Center's

financial expert, would not have access to the Center's financial reporting and analysis for the Center's activities.  Insisting that financial analysis was HSPI's role, Kaniewski unilaterally arranged for all payments made to CPR to be routed to HSPI's account, which prevented the creation of a paper trail demonstrating that CPR was generating revenue rather than HSPI, Mr. Kaniewski's office.

22.     Mr. Kaniewski issued these orders to Mr. Solomon in January 2012 to hide the fact that the Center was generating sponsored projects and new sources of funding for GW, while his office (HSPI) failed to generate any new revenue for Fiscal Year 2012.

23.     On April 12, 2012, Mr. Lombardi agreed with David Garner, a project manager for the GATA subcontracts at SAIC, that GW would be considered for additional task orders beyond those already certified by Mr. Lombardi.  At that time, given that the number of potential task orders was increasing, Mr. Lombardi believed that further task orders would be submitted to GW as early as the Summer of 2012.

24.     On May 8, 2012, Mr. Solomon learned that Reaghan Bik, an assistant to Mr. Kaniewski, had contacted GW personnel to make him the PI to the GATA contract, without seeking the consent of SAIC, Mr. Lombardi, the designated PI, or the federal government.  Ms. Bik had contacted several GW staffers at both the Washington, D.C. and Virginia campuses to ask how Mr. Kaniewski could be added to the GATA contract as PI without amending any of the documents already submitted to SAIC and the government — in other words, making the change secretly without notifying SAIC or the federal government.

25.     Mr. Kaniewski's plan became increasingly clear: after GW had used Mr. Lombardi's credentials to obtain government contract dollars, GW would engage in a "bait and switch" by removing him once the contracts were secured.  Several events in the Spring of 2012

made this apparent.  In March 2012, OVPR chief of staff Gina Lohr, who worked closely with

Mr. Kaniewski and took direction from him, reprimanded Abini Bloodworth, a GW staffer,

because Ms. Bloodworth assisted CPR with a funding proposal, which would extend Mr.

Lombardi's work as a PI.  Another GW procurement staffer, Georgette Yakalis, stated to Mr.

Solomon that she was aware of numerous e-mails from Ms. Lohr that instructed OVPR,

including Virginia campus personnel, that HSPI projects must always take priority over Center

projects, that Mr. Kaniewski must be consulted about all CPR projects, and, most significantly,

that Mr. Lombardi had approved this approach.  In fact, Mr. Lombardi had not done so, as Mr.

Kaniewski and his subordinates well knew.

<u>Mr. Kaniewski's Lack of Qualifications to Serve as PI on GATA.</u>

26.     GW misled SAIC and the federal government by representing that Mr. Lombardi

would serve as technical representative and PI on GATA task orders after the subcontract had

been approved by the government, when in fact Mr. Kaniewski was the intended PI for those

task orders.  Mr. Lombardi had an extensive career in the military dealing with emergency

readiness and training programs and had an established track record of working successfully as a

PI in that field on prior sponsored programs at GW.  Because of this experience, he was

specifically sought after by SAIC as the subcontract technical representative for performing task

orders.

27.     Mr. Kaniewski, in sharp contrast, did policy work, and had almost no experience

in emergency preparedness work, other than some experience as a firefighter and paramedic.

Mr. Kaniewski had no experience working on federally funded training or development work

prior to putting himself in Mr. Lombardi's place as PI in 2012.

<u>Mr. Lombardi Reported Mr. Kaniewski's Unlawful Conduct to High-level GW Officials.</u>

28.     In response to news from Center staff and others that Mr. Kaniewski was seeking to replace Mr. Lombardi as PI on the GATA subcontract and other projects, Mr. Lombardi made several efforts to bring Mr. Kaniewski's unlawful conduct to the attention of GW officials.

29.     On May 13, 2012, Mr. Lombardi met with Dr. Chalupa to discuss Mr. Kaniewski's efforts to replace him as PI on projects already generated by CPR while failing to inform GW's partners, particularly SAIC.  Dr. Chalupa dismissed his concerns, and stated "you must have misunderstood, or that was hearsay, that could never happen."  Dr. Chalupa's comment made it clear that Mr. Kaniewski's substitution of himself for Mr. Lombardi as PI, without the knowledge of SAIC or the U.S. government, would be in violation of federal grant requirements and constituted a false claim to the government.

30.     At the same May 13, 2012 meeting, Dr. Chalupa confirmed the funding arrangement that had been agreed upon in the Fall of 2011 regarding CPR's funding.  When Mr. Lombardi specifically raised the issue of the University's funding commitment to CPR, Dr. Chalupa confirmed that it was his understanding that GW would completely fund CPR through the Fall of 2012, then provide 60 percent funding for the following year.

31.     Approximately two weeks later, Mr. Lombardi took his concerns about Mr. Kaniewski's efforts to replace him as PI to GW's Office of General Counsel.  He explained that Mr. Kaniewski was replacing him without prime contractor or governmental approval and that he was interfering with his work as designated PI on the subcontracts under GATA by directing University support staff not to assist CPR with its pursuit of new projects or finalizing current ones.  The GW attorney stated that she would look into the matter further, but took no action.

32.     Mr. Kaniewski terminated Mr. Solomon on May 30, 2012, on the pretextual basis that there was no University funding to support his position.  Mr. Kaniewski and Mr. Ciluffo also reduced Mr. Lombardi's salary by 50 percent on May 28, 2012, again citing lack of University funding, even though CPR was well on its way to securing a FEMA subcontract with SAIC that would satisfy the future funding requirements.

<u>Mr. Kaniewski Improperly Replaced Mr. Lombardi as PI on the FEMA Subcontract.</u>

33.     The Center had lengthy negotiations with SAIC to develop a bid for a contract with FEMA and DHS for a national training project termed FEMA-NED.  Once approved, FEMA-NED would generate sufficient revenue to cover Mr. Lombardi's salary at CPR for more than two years.  Mr. Lombardi had his resume and credentials as proposed PI extensively reviewed by SAIC staff in preparation for SAIC's submission to the government.

34.     On July 2, 2012, just days before the submission deadline, Mr. Kaniewski intercepted the subcontractor certification and removed Mr. Lombardi's name and replaced it with his own.  He did so without notice to Center personnel and without notice to SAIC.  Mr. Kaniewski and Ms. Lohr then insisted that the subcontracting documents that they prepared be submitted without any further review by GW personnel, in order to hide the fact that they had changed the PI without SAIC's approval.

35.     Mr. Kaniewski's deceitful removal of Mr. Lombardi as PI alarmed SAIC, as SAIC procurement specialists expressed concern that Mr. Kaniewski's lack of qualifications would undermine the bid.  SAIC staff had reviewed Mr. Lombardi's qualifications and position description as a technical representative carefully for weeks prior to the submission — their work was eliminated overnight by Mr. Kaniewski.  When SAIC representatives contacted Mr. Kaniewski's office to inquire why Mr. Kaniewski had substituted himself for Mr. Lombardi at

the last moment without any prior discussion with them, Ms. Bik, Mr. Kaniewki's assistant, claimed that Mr. Lombardi was ineligible to serve as PI because his salary and duties had been reduced by 50 percent in May.  Her statement was an outright lie.

36.     Jackie Bendall, Director of Sponsored Projects Administration for GW, also expressed concern that Mr. Kaniewski, by replacing Mr. Lombardi as PI, may have engaged in illegal conduct.   As she described it to Mr. Lombardi, this sort of behavior could "end up with us wearing stripes," a reference to incarceration for misrepresenting or omitting material facts to the government.

37.     Upon learning that he had been replaced at the last moment, without notice to him or SAIC despite the close preparation that had gone into establishing his credentials as PI, Mr. Lombardi once again attempted to raise Mr. Kaniewski's improper conduct with GW's General Counsel's Office.  In early July, 2012, Mr. Lombardi met once again with the GW attorney he had first contacted in May and specifically informed her that Mr. Kaniewski now had not only interfered with the prior arrangements for GATA, but had misled SAIC and replaced Mr. Lombardi without warning or negotiation.  The attorney, again, did nothing.

38.     When the General Counsel's Office again ignored his reports of Mr. Kaniewski's illegal conduct, Mr. Lombardi raised the issue with Mr. Ciluffo, on or about July 24, 2012.  Mr. Ciluffo's only substantive response about the interference with Mr. Lombardi's duties was to explain "I can't talk to you about this, you went over our heads," referring to Mr. Lombardi's meetings with the General Counsel and Dr. Chalupa.  Although Mr. Lombardi and Mr. Ciluffo had maintained a collegial relationship up until that point, it was then clear that Mr. Ciluffo was not going to take any action to prevent Mr. Kaniewski's illegal takeover of the PI role from Mr. Lombardi, in derogation of representations made to the government through the prime

contractor, SAIC, and that he was angry at Mr. Lombardi for his reports of these false claims to Dr. Chalupa and the Office of General Counsel.

39.     In this same conversation on July 24, 2012, Mr. Lombardi proposed to Mr. Ciluffo that he allow him (Lombardi) to continue operating CPR even if the purported funding problem persisted.  It is a common practice at GW for the directors of centers or other small divisions within the university to receive no salary for their role until they generate sponsored-projects revenue.  For example, Dr. Joseph Barbera, a GW professor, is only paid a salary for his work on behalf of University research centers he directs when the centers receive outside project funding, yet continues to serve as the director of those centers in between projects.  Mr. Ciluffo expressed agreement with this idea, and stated that he would schedule a meeting to discuss it further with Mr. Lombardi.

40.     On July 27, 2012, less than three weeks after Mr. Lombardi's meetings with GW in-house attorneys and only three days after his conversation with Mr. Ciluffo, Mr. Lombardi attended a meeting for the stated purpose of speaking with Mr. Ciluffo and Mr. Kaniewski about his continued work at GW.  When Mr. Lombardi arrived, however, Mr. Kaniewski and a GW Human Resources representative met him.  Mr. Kaniewski stated he was terminating Mr. Lombardi, and gave him a letter that falsely stated that Mr. Lombardi's position was being terminated because no outside funding had been generated to support his position.

41.     Mr. Kaniewski's statement was blatantly false: between GATA and FEMA-NED, there would have been millions of dollars in sponsored projects for CPR staff, including Mr. Lombardi, to manage over the next several years, funding which would easily cover their salaries.  This claim further contradicted Dr. Chalupa's statement that both the Center and HSPI were to be fully funded by the University through at least September 2012.  Specifically, in this

letter Mr. Kaniewski asserted that "HSPI was able to temporarily fund your position from October 2011 to date," contradicting Dr. Chalupa's acknowledgment in May that Mr. Lombardi's position was fully funded for Fiscal Year 2012 and then partially funded for Fiscal Year 2013.  Moreover, Mr. Kaniewski was personally aware that project funding for Mr. Lombardi's position would be forthcoming as soon as SAIC issued task orders to GW under GATA.

42.     Mr. Lombardi then asked Mr. Kaniewski about his proposed solution, which he had discussed with Mr. Ciluffo three days earlier — he would continue to serve as Director of CPR and would resume drawing a salary when project funding came in.  Mr. Kaniewski claimed that he had spoken with Mr. Ciluffo and stated "we just can't do that."  This statement was false, as the university had previously permitted and continues to permit precisely this arrangement for Principal Investigators who pursue long-term sponsored projects.  It was apparent Mr. Kaniewski's intent was to remove Mr. Lombardi from his position, not simply address this nonexistent budget shortfall, less than a month after Mr. Lombardi's last in a series of complaints to high-level GW officials about Mr. Kaniewski's illegal efforts to replace him as PI.

43.     GW, through the deliberate inaction of Dr. Chalupa, the Office of General Counsel, and Mr. Ciluffo, allowed Mr. Kaniewski to mislead SAIC and the government about performance of the GATA subcontract by permitting Mr. Kaniewski to engage in a "bait and switch."  GW obtained task orders from SAIC and the federal government on the basis of representations that Mr. Lombardi would perform those task orders as the technical representative and PI, and then Mr. Kaniewski sought to replace Mr. Lombardi in that role without notifying SAIC or the federal government.  When Mr. Lombardi complained about the false claims for payment on the task orders that would result, GW terminated Mr. Lombardi on

the basis of a false budgetary rationale that Mr. Kaniewski simply invented to prevent further

reports about his misconduct.

## COUNT ONE

### JOHN LOMBARDI AGAINST THE GEORGE WASHINGTON UNIVERSITY
### FOR RETALIATION IN VIOLATION
### OF THE FALSE CLAIMS ACT,
### 31 U.S.C. § 3730 *et seq.*

44.     Plaintiff restates and incorporates by reference each paragraph above, as though

fully set forth herein.

45.     Mr. Lombardi engaged in protected activity by reporting Mr. Kaniewski's efforts

to mislead SAIC and the government to Dr. Chalupa on May 13, 2012, to GW's Office of

General Counsel in late May 2012, and to the Office of General Counsel again in early July

2012, and to the Director of Sponsored Projects Administration in July 2012.

46.     Mr. Lombardi's complaints to Dr. Chalupa, the Office of General Counsel, and

the Director of Sponsored Projects Administration constituted protected activity because these

reports were based on his good-faith belief that unless Mr. Kaniewski's conduct in replacing him

as PI and technical representative on the GATA task orders was stopped or prevented, it would

result in material misrepresentations to SAIC as prime contractor and the federal government

regarding which GW personnel would perform as PI on the subcontract to SAIC, based on the

prior representations made to the government that Mr. Lombardi would serve as the technical

representative.

47.     GW, through Mr. Kaniewski and Mr. Ciluffo as its agents, retaliated against

Plaintiff by terminating his employment. Mr. Ciluffo acknowledged Mr. Kaniewski's retaliatory

motive in terminating Mr. Lombardi when he stated on July 24, 2012 to Mr. Lombardi that

"there was nothing [else we] could do" because "you went over our heads."

48.     GW has sought to justify Mr. Lombardi's termination on the pretext that GW lacked funding to continue his position, but this claim is pretextual.  GW's own management, including Dr. Chalupa, acknowledged that Mr. Lombardi's position was fully funded through July 2012 and was partially funded through July 2013.

49.     Since Mr. Lombardi's termination and his replacement by Mr. Kaniewski, SAIC has refused to issue task orders under GATA to GW, because SAIC is fully aware that Mr. Kaniewski was not qualified and different representations were made to the government about the technical representative on the project.

50.     By terminating Mr. Lombardi's employment, GW violated the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h).

51.     As a result of GW's termination of his employment, Mr. Lombardi has suffered and continues to suffer economic losses in the form of lost past and future wages and benefits, and emotional distress damages, including pain and suffering, and personal humiliation.

52.     GW intentionally or recklessly, and with intent to harm Mr. Lombardi, cut his salary and terminated his employment.  GW knew, on the basis of Mr. Lombardi's reports to Dr. Chalupa, the Office of General Counsel, and the Director of Sponsored Projects Administration, that Mr. Kaniewski was engaging in fraudulent conduct, and instead of preventing that conduct, retaliated against Mr. Lombardi for his whistleblowing reports.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant him the following relief:

1.     An award of past and future lost wages and benefits;

2.     An award of compensatory damages for emotional distress, shame and

humiliation, in an amount appropriate to the proof presented at trial;

      3.      An award of punitive damages;

      4.      An award to plaintiff of reasonable attorneys' fees and costs;

      5.       Pre- and post-judgment interest; and

      6.      All other relief as this Court deems just.


Respectfully submitted,

*/s/ Lynne Bernabei*

_____
Lynne Bernabei, Esquire, D.C. Bar # 938936
Alan R. Kabat, D.C. Bar # 464258
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7102
(202) 745-1942
fax (202) 745-2627
Email:  Bernabei@Bernabeipllc.com
               Kabat@Bernabeipllc.com


DATED:  October 7, 2013

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
JOHN LOMBARDI,                                  )
                                                )    Civil No. 1:13-cv-1542
                    Plaintiff,                  )
                                                )
        v.                                      )    ECF Case
                                                )
THE GEORGE WASHINGTON UNIVERSITY,               )
                                                )
                    Defendant.                  )
_____)

## JURY TRIAL DEMANDED

Pursuant to Rule 38, Fed. R. Civ. P., Plaintiff demands trial by jury on all claims so triable.

Respectfully submitted,


*/s/ Lynne Bernabei*

_____
Lynne Bernabei, Esquire, D.C. Bar # 938936
Alan R. Kabat, D.C. Bar # 464258
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7102
(202) 745-1942
fax (202) 745-2627
Email:  Bernabei@Bernabeipllc.com
            Kabat@Bernabeipllc.com


DATED:  October 7, 2013