UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN LOMBARDI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 13-1542 (RMC) |
| | ) |
| GEORGE WASHINGTON UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

**OPINION**

John Lombardi was fired from George Washington University after he complained about efforts to replace him as principal investigator on a subcontract with the U.S. Department of State. He claims that his termination constituted unlawful retaliation because George Washington University fired him after he reported concerns about the failure to obtain prior approval to replace him on the subcontract. He now sues George Washington University under the False Claims Act, alleging that he was terminated in retaliation for attempting to prevent future false certifications on a government subcontract. George Washington University moves to dismiss for failure to state a claim. For the reasons set forth below, the Court will grant the motion.

**I.  FACTS**

John Lombardi has extensive experience in emergency preparedness and medical planning. He served in the U.S. Army for twenty-eight years, including as the Army's Director of Domestic Emergency Preparedness for Medical Programs. In 2007, Mr. Lombardi joined George Washington University (GW) as the Director of Grants and Training in the Office of

1

Homeland Security. GW maintains several research centers and institutes, which are directed by University personnel but rely on funding from external sources. The University tasked Mr. Lombardi with securing external funding for research centers and institutes within the Office of Homeland Security. From 2007 to 2009, Mr. Lombardi doubled GW's grant and contract revenue, which helped fund various University departments, centers, and institutes. From 2007 to 2011, Mr. Lombardi also served as GW's principal investigator on grants and contracts worth approximately $18 million. Compl. [Dkt. 1] ¶¶ 5–6.

### A. GATA Subcontract

In 2010, the Science Applications International Corporation (SAIC), a major government contractor, prepared to submit a bid to the U.S. Department of State (State Department) for the Global Anti-Terrorism Training Assistance (GATA) project.[1] Mr. Lombardi proposed that SAIC enter into a subcontracting agreement with GW to service the GATA project.

On June 22, 2011, the State Department awarded SAIC the prime contract for the GATA project, along with GW and twelve other subcontractors identified in SAIC's proposal. *Id.* ¶ 9. GW had represented to SAIC that Mr. Lombardi would serve as principal investigator on the GATA subcontract to GW, and therefore would certify the proposal and verify future regulatory compliance. In turn, SAIC had represented to the State Department that Mr. Lombardi would serve as principal investigator on the GATA subcontract to GW. *Id.* This arrangement was referenced in the subcontract, which identified Mr. Lombardi as the technical

---

[1] Mr. Lombardi's Complaint does not describe the underlying goal of the GATA project. *See* Compl. ¶ 8 (describing the GATA project as a "subcontract between SAIC, GW and the Department of State"). As part of the GATA subcontract, GW held an executive training seminar and created a program for partnering countries to receive GATA training materials. *Id.* ¶ 11.

representative[2] responsible for performing task orders on the subcontract.  GW expected to earn approximately $5 million over five years from the GATA subcontract.

### B. Center for Preparedness and Resilience

Mr. Lombardi worked alongside other staff members in GW's Grants and Training Department.  Until the fall of 2011, the salaries of Mr. Lombardi and his team were funded by a multi-year grant from the Department of Homeland Security (DHS) and the Federal Emergency Management Administration (FEMA).  After the grant expired, GW required the Grants and Training Department to seek external funding under the moniker "the Center for Preparedness and Resilience."[3]

In July of 2011, Daniel Kaniewski, Assistant Vice President for GW's Office of Homeland Security, informed Mr. Lombardi that he would have to secure new sources of outside funding to support his salary.  *Id.* ¶ 14.  Mr. Kaniewski stated that, "to provide Grants and Training sufficient time to generate new sponsored programs, the University would fully fund the Center's staff for Fiscal Year 2012 (June 30, 2011 through July 1, 2012) and would provide 60 percent of its funding for Fiscal Year 2013."  *Id.*  Mr. Kaniewski also directed Mr. Lombardi to "attract new sponsors and create a pool of contracts and awards that would allow the Center to become self-sufficient by the end of Fiscal Year 2013."  *Id.* ¶ 15.  This funding structure provided GW funding at reduced amounts, requiring Mr. Lombardi to terminate several employees in the Grants and Training Department during the summer of 2011.

---

[2] The Complaint does not distinguish between the "principal investigator" and the "technical representative," but instead refers to these titles interchangeably.

[3] Mr. Lombardi's Complaint does not include any further detail as to why GW changed the name of the Grants and Training Department beyond the fact that GW created the Center for Preparedness and Resilience as an alternative title.  Mr. Lombardi uses both titles interchangeably throughout the Complaint.  The Center was formally established as a distinct entity on December 12, 2011.

Mr. Lombardi did not anticipate any further restrictions based on the new funding structure. As of September 2011, the Center for Preparedness and Resilience expected to earn approximately $5 million on the GATA subcontract. The Center applied for two anti-terrorism awareness seminars with the State Department, which would have provided GW with approximately $120,000 per event, and also applied for a revenue-sharing arrangement with a conference hosting company worth approximately $100,000. Finally, the Center anticipated twenty-four additional projects with SAIC, federal agencies, and outside sponsors by the end of 2012. *Id.* ¶ 13.

Dr. Leo Chalupa, GW's Vice President for Research, initially directed that the Center for Preparedness and Resilience would be required to raise $2 million in its first two years, *i.e.*, by December of 2013. However, Mr. Lombardi alleges that, "[a]t a meeting in October 2011, Mr. Kaniewski suddenly reversed this arrangement and stated that he would be evaluating the Center's financial contributions to the University on a week-to-week basis in consultation with the [Office of the Vice President for Research]." *Id.* ¶ 20.

Mr. Lombardi submitted a proposal to establish the Center for Preparedness and Resilience formally in November of 2011. The request was approved on December 12, 2011, by Dr. Chalupa, and the Center was placed within GW's Office of Homeland Security. Thus, after December 12, 2011, GW's Office of Homeland Security was comprised of two subdivisions: (1) the Center for Preparedness and Resilience and (2) the Homeland Security Policy Institute. *Id.* ¶ 17.

The charter for the Center for Preparedness and Resilience provided that the organization would exist for at least five years and would report to the Homeland Security Policy Institute. Mr. Lombardi served as Director of the Center for Preparedness and Resilience. His

direct supervisor, Frank Ciluffo, was the Director of the Homeland Security Policy Institute and the Associate Vice President for Homeland Security. Mr. Lombardi also reported to Mr. Kaniewski, the Deputy Director of the Homeland Security Policy Institute.[4]

Mr. Lombardi alleges that, after the formal establishment of the Center for Preparedness and Resilience, Mr. Kaniewski altered the financial reporting structure to give the Homeland Security Policy Institute greater control over the Center. Financial analyses were initially performed by Scott Solomon, the Senior Assistant Director for Finance and Operations, and the financial expert within the Center for Preparedness and Resilience. However, Mr. Kaniewski insisted that any financial analyses should be performed by the Homeland Security Policy Institute and "unilaterally arranged for all payments made to [the Center] to be routed to [the Homeland Security Policy Institute's] account," which prevented the Center from documenting its increased revenue. *Id.* ¶ 21. Mr. Lombardi alleges that Mr. Kaniewski altered the financial reporting structure to "hide the fact that the Center was generating sponsored projects and new sources of funding for GW, while [the Homeland Security Policy Institute] failed to generate any revenue for Fiscal Year 2012." *Id.* ¶ 22. Despite Mr. Kaniewski's alleged efforts to undermine the Center for Preparedness and Resilience, Mr. Lombardi believed that the Center would receive additional task orders and funding in the summer of 2012.

But on May 8, 2012, Mr. Solomon learned that Mr. Kaniewski's assistant had contacted several GW employees to inquire whether and how Mr. Kaniewski could be added as principal investigator on the GATA subcontract without amending the existing subcontract. *Id.* ¶ 24. In addition, several emails allegedly (1) asked Dr. Chalupa's office to give precedence to

---

[4] Mr. Lombardi contends that he reported directly to Mr. Ciluffo, but he alleges that Mr. Kaniewski made various organizational and employment decisions affecting the Center for Preparedness and Resilience. The Court infers from these allegations that Mr. Lombardi also reported directly to Mr. Kaniewski.

any projects from the Homeland Security Policy Institute over projects from the Center for Preparedness and Resilience, (2) requested that staff members be required to consult Mr. Kaniewski on all projects for the Center for Preparedness and Resilience, and (3) informed Dr. Chalupa's office that Mr. Lombardi had approved the new approach.  *Id.* ¶ 25.  To the contrary, Mr. Lombardi had not approved the new priority structure.

### C. Reporting to GW Officials

Certain unidentified GW personnel told Mr. Lombardi that Mr. Kaniewski was seeking to replace him as principal investigator on the GATA subcontract.  Because Mr. Lombardi believed that Mr. Kaniewski was deceiving SAIC by attempting to replace him as principal investigator without approval, Mr. Lombardi met with Dr. Chalupa on May 13, 2012, to report Mr. Kaniewski's conduct.  Dr. Chalupa responded that Mr. Lombardi "must have misunderstood, or that was hearsay, that could never happen."  *Id.* ¶ 29 (internal quotation marks omitted).  Mr. Lombardi interpreted Dr. Chalupa's comment to mean that Mr. Lombardi's replacement as principal investigator would have resulted in the submission of a false claim.  Dr. Chalupa also told Mr. Lombardi that "it was his understanding" that GW would provide full funding for the Center for Preparedness and Resilience through the fall of 2012, and then sixty-percent funding for Fiscal Year 2013.  *Id.* ¶ 30.

Mr. Lombardi was dissatisfied with the outcome of his meeting with Dr. Chalupa. Approximately two weeks later, Mr. Lombardi met with GW's Office of the General Counsel to explain Mr. Kaniewski's efforts to replace him and express his concern that Mr. Kaniewski was interfering with his work as principal investigator on the GATA project by directing GW support staff to avoid assisting the Center with new or existing projects.  *Id.* ¶ 31.  Mr. Lombardi

contends that the General Counsel said that she would investigate the matter, but ultimately took no action on his complaint.

On May 28, 2012, after Mr. Lombardi reported Mr. Kaniewski's conduct to GW officials, Mr. Kaniewski and Mr. Ciluffo reduced Mr. Lombardi's salary and duties by fifty percent, allegedly due to limited funding. Mr. Lombardi contends that his salary reduction was not warranted because the Center was "well on its way to securing a FEMA subcontract with SAIC that would [have] satisf[ied] the future funding requirements." *Id.* ¶ 32.

### D. FEMA-NED Subcontract

Mr. Lombardi continued in his role as principal investigator and began negotiating with SAIC to develop a contracting bid to DHS and FEMA, *i.e.*, the "FEMA-NED project." *Id.* ¶ 33. Mr. Lombardi believed that, once the FEMA-NED project was approved, it would generate enough revenue to cover Mr. Lombardi's salary for more than two years. He avers that SAIC reviewed his resume and credentials to prepare its bid.

On July 12, 2012, just days before the submission deadline for the FEMA-NED project, Mr. Kaniewski "removed Mr. Lombardi's name [from the subcontractor certification] and replaced it with his own." *Id.* ¶ 34. Mr. Lombardi contends that Mr. Kaniewski substituted his own name on the certification without notifying personnel at the Center for Preparedness and Resilience or SAIC, and directed that the revised documents be submitted without further review from GW personnel "to hide the fact that they had changed the [principal investigator] without SAIC's approval." *Id.* This last-minute change alarmed SAIC personnel, who allegedly expressed their concern that Mr. Kaniewski's limited experience would undermine the FEMA-NED bid. When SAIC personnel asked why Mr. Lombardi had been removed as the subcontracting representative, Mr. Kaniewski's assistant responded that Mr. Lombardi was

ineligible to serve as principal investigator because his salary and duties had been reduced by fifty percent. *Id.* ¶ 35.

Shortly thereafter, Jackie Bendall, GW's Director of Sponsored Projects Administration, also expressed concern with Mr. Lombardi's replacement as principal investigator on the FEMA-NED subcontract. Ms. Bendall allegedly stated that the replacement of Mr. Lombardi could "end up with us wearing stripes," which Mr. Lombardi interpreted as a "reference to incarceration for misrepresenting or omitting material facts to the government." *Id.* ¶ 36.

Based on Mr. Kaniewski's actions in connection with the FEMA-NED subcontract, Mr. Lombardi again attempted to report Mr. Kaniewski's conduct to certain GW officials. In July of 2012, Mr. Lombardi met with GW's Office of the General Counsel to report that Mr. Kaniewski had "not only interfered with the prior arrangements for GATA, but had misled SAIC and replaced Mr. Lombardi without warning or negotiation." *Id.* ¶ 37. But again, the General Counsel failed to address Mr. Lombardi's concerns.

On or about July 24, 2012, Mr. Lombardi met with Mr. Ciluffo to discuss his replacement as principal investigator on the FEMA-NED contract. Mr. Ciluffo allegedly responded, "I can't talk to you about this, you went over our heads," *id.* ¶ 38, in reference to Mr. Lombardi's meetings with Dr. Chalupa and the Office of the General Counsel. Mr. Lombardi alleges that Mr. Ciluffo was "angry at Mr. Lombardi for his reports of . . . false claims to Dr. Chalupa and the Office of [the] General Counsel." *Id.* Mr. Lombardi suggested to Mr. Ciluffo that if the Center's funding did not increase over time, Mr. Lombardi could be allowed to continue as Director of the Center without drawing a salary until he secured external funding.

Mr. Ciluffo agreed to Mr. Lombardi's proposal and informed Mr. Lombardi that he would schedule a meeting to discuss the arrangement further. *Id.* ¶ 39.

### E. Mr. Lombardi's Termination

On July 27, 2012, three days after Mr. Lombardi's conversation with Mr. Ciluffo and less than three weeks after his meetings with GW's Office of the General Counsel, Mr. Lombardi attended a meeting for the stated purpose of speaking with Mr. Ciluffo and Mr. Kaniewski about his work at the University. When Mr. Lombardi arrived, however, he was greeted by Mr. Kaniewski and a Human Resources representative. Mr. Kaniewski terminated Mr. Lombardi's employment and gave him a letter stating that the Homeland Security Policy Institute could only fund his position from October of 2011 through July of 2012.

Mr. Lombardi disputes the asserted basis for his termination. He alleges that "between GATA and FEMA-NED, there would have been millions of dollars in sponsored projects for [Center] staff, including Mr. Lombardi, to manage over the next several years . . . which would [have] easily cover[ed] their salaries." *Id.* ¶ 41. He further notes that the representations in his termination letter directly contradicted Dr. Chalupa's prior statement that GW would provide funding for the Center for Preparedness and Resilience through Fiscal Year 2012, and would provide partial funding for Fiscal Year 2013.

Mr. Lombardi proffered the solution that Mr. Ciluffo had previously accepted, namely, that Mr. Lombardi continue to serve as Director of the Center for Preparedness and Resilience and only resume drawing a salary once he secured additional funding. Mr. Kaniewski rejected that proposal without discussion, stating that "we just can't do that." *Id.* ¶ 42. Mr. Lombardi contends that GW previously allowed and continues to allow other principal investigators to work under his proposed salary arrangement.

After Mr. Lombardi's termination, Mr. Kaniewski substituted himself for Mr. Lombardi as principal investigator on the GATA subcontract. Since GW made this substitution in 2012, SAIC has not issued any task orders to GW, and the University has neither requested nor received payment on the subcontract.

**F.  Procedural History**

Mr. Lombardi filed his Complaint on October 7, 2013, alleging that GW unlawfully terminated his employment in violation of the False Claims Act (FCA), 31 U.S.C. § 3730 *et seq.* While Mr. Lombardi's theory of liability is not entirely clear, he appears to allege that GW would have submitted false certifications to SAIC to support future claims for payment on the GATA subcontract.[5] Therefore, by reporting his concerns about the potential submission of false certifications, Mr. Lombardi alleges that he engaged in protected activity under the FCA and is therefore protected from retaliation.

GW moved to dismiss on December 9, 2013, arguing that Mr. Lombardi has failed to allege sufficient facts to support his allegation that GW terminated his employment in retaliation for reporting an existing or prospective violation of the FCA. Mr. Lombardi responds that, even if he failed to discover or report conduct that would have violated a substantive provision of the FCA, the statute's retaliation provision broadly protects employees who have

---

[5] Mr. Lombardi noted that his FCA claims are based solely on the GATA subcontract. Mr. Lombardi included allegations regarding the FEMA-NED subcontract because he contends that this incident "confirmed [his] belief that Mr. Kaniewski was . . . engaging in deceitful and misleading conduct in his efforts to take over performance of GATA task orders." Opp'n [Dkt. 9-1] at 9 n.6. Therefore, he contends that "[t]he FEMA-NED incident . . . contributed to Mr. Lombardi's reasonable belief that he was reporting fraudulent conduct with respect to GATA . . . ." *Id.*

any reason to believe that a materially false claim or certification will be submitted to the government.  GW's motion to dismiss was fully briefed on March 19, 2014.[6]

## II.  LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim.  A complaint must be sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and quotation marks omitted).  Although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds for his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id*.  The facts alleged "must be enough to raise a right to relief above the speculative level."  *Id*.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face."  *Id*. at 570.  A court must treat the complaint's factual allegations as true, "even if doubtful in fact."  *Id*. at 555.  But a court need not accept as true legal conclusions set forth in a complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by

---

[6] On January 28, 2014, Mr. Lombardi filed a motion for leave to file a sur-reply to address new arguments presented by GW in its reply brief.  The Court granted his request and allowed the University to submit an opposition to the sur-reply, which was filed on March 19, 2014.

reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

### III.  ANALYSIS

GW moves to dismiss Mr. Lombardi's Complaint, arguing that he has insufficiently alleged that he participated in protected activity or that GW had knowledge of his protected activity.  In opposition, Mr. Lombardi claims that GW terminated his employment in retaliation for reporting conduct that he reasonably believed would result in the submission of false certifications under the GATA contract.  Specifically, Mr. Lombardi avers that his replacement as technical representative on the GATA subcontract without SAIC's prior approval would have resulted in the submission of a false certification regarding the identity of the technical representative.  Because Mr. Lombardi's claim rests on speculative actions that fail to establish an objectively reasonable basis for his belief that GW would have submitted false claims, the Court will grant GW's motion to dismiss.[7]

The FCA incorporates broad anti-retaliation protection for whistleblowers.  The FCA provides that:

> [a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section *or other efforts to stop [one] or more violations of this subchapter*.

31 U.S.C. § 3730(h)(1) (emphasis added).

---

[7] The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Venue is proper in this Court because GW resides in the District of Columbia and a substantial part of the events giving rise to this lawsuit occurred in the District of Columbia.  *See* 28 U.S.C. § 1391(b)(1)–(2).

"To make out a claim of retaliation under the FCA, an employee must demonstrate that: '(1) he . . . engaged in protected activity and (2) he . . . was discriminated against because of that activity.'" *Sharma v. District of Columbia*, 881 F. Supp. 2d 138, 141 (D.D.C. 2012) (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)). For the first requirement, *i.e.*, engaging in protected activity, "it is sufficient that a plaintiff be investigating matters that reasonably could lead to a viable False Claims Act case." *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 66 (D.C. Cir. 2008) (internal quotation marks and citation omitted). The broad scope of this requirement "manifests Congress' intent to protect employees while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." *Yesudian*, 153 F.3d at 740 (emphasis in original).

Mr. Lombardi alleges that he reported Mr. Kaniewski's efforts to replace him as principal investigator on the GATA subcontract because he believed that Mr. Kaniewski's conduct constituted illegal activity under the FCA.[8] *See, e.g.,* Compl. ¶ 28 ("In response to news from Center staff and others that Mr. Kaniewski was seeking to replace Mr. Lombardi as [principal investigator] on the GATA subcontract . . . Mr. Lombardi made several efforts to bring Mr. Kaniewski's unlawful conduct to the attention of GW officials."); *id.* ¶ 31 (noting that Mr. Lombardi reported "Mr. Kaniewski's efforts to replace him" as principal investigator on the GATA subcontract). Mr. Lombardi further alleges that he "reasonably believed that his certifications [on the GATA subcontract] would be rendered false if his supervisor took over

---

[8] Mr. Lombardi's Complaint expressly alleges that GW would have submitted false *claims* by misrepresenting the identity of the technical representative. In his opposition brief, Mr. Lombardi also references a false *certification* theory. GW contends that Mr. Lombardi's false certification theory was not presented in his Complaint and was asserted for the first time in opposition to GW's motion to dismiss. Accordingly, GW urges the Court to decline to consider the argument. *See* Reply [Dkt. 11] at 2. However, because the factual bases for Mr. Lombardi's theories are not clearly delineated in the Complaint or in briefing, the Court refers to both theories interchangeably throughout this Opinion.

performance of the contract without providing notice to the federal government, and that those certifications were material to the government's willingness to pay." Opp'n at 1. Thus, Mr. Lombardi avers that his reporting constituted protected activity because he sought to prevent the future submission of false claims and certifications on the GATA subcontract.

The actual terms of the subcontract do not reveal any reasonable or imminent risk that GW would have submitted false claims. Under the GATA subcontract, SAIC issued individual task orders to GW on an as-needed basis. *See* Compl. ¶ 9 ("Based on GW's representations to SAIC, SAIC represented to the government that Mr. Lombardi was to serve as the [principal investigator] for *future task orders to be awarded to GW* under the GATA contract." (emphasis added)); *id.* ¶ 11 (noting that SAIC initially assigned two task orders to GW under the GATA subcontract). The subcontract itself did not require performance or create a right to collect payment. Instead, SAIC and GW were required to agree to specific task orders to create continuing rights and obligations under the subcontract. For this reason, GW's identification of Mr. Lombardi as the principal investigator on the GATA subcontract did not necessarily guarantee his continued performance: GW could have proposed a different principal investigator if required by a task order or if Mr. Lombardi quit, and the replacement would have been authorized so long as it was fully disclosed in GW's task order submissions, accepted by SAIC, and approved by the State Department.

The D.C. Circuit's discussion in *Hoyte v. American National Red Cross* provides an analytical framework to consider the reasonableness of Mr. Lombardi's retaliation claim. *See* 518 F.3d at 67–69. There, the Circuit emphasized, based on its prior decision in *Yesudian*, 153 F.3d at 740, that to establish protected activity, the plaintiff must have been "'investigating matters that reasonably could lead to a viable False Claims Act case.'" *Hoyte*, 518 F.3d at 68

14

(quoting *Yesudian*, 153 F.3d at 740). The Circuit directed that mere "subjective beliefs" do not provide an "objectively reasonable basis to believe" that a plaintiff investigated "matters that reasonably could lead to a viable False Claims Act case." *Id.* (citing *Lang v. Nw. Univ.*, 472 F.3d 493, 495 (7th Cir. 2006) ("What [a plaintiff] actually believed is irrelevant . . . . The right question is whether [his] belief had a reasonable objective basis . . . .")) (other citation omitted).

Mr. Lombardi alleges that Mr. Kaniewski's assistant made inquiries in May of 2012 about replacing Mr. Lombardi as principal investigator without amending the GATA subcontract. When Mr. Lombardi reported his suspicions to Dr. Chalupa, Dr. Chalupa answered "'that could never happen.'" *Id.* ¶ 29. And, indeed, it did not happen. Mr. Lombardi continued to serve as principal investigator on the GATA subcontract until the end of July 2010.

Mr. Lombardi merely speculates when he contends that Mr. Kaniewski's efforts to replace him as principal investigator would have led to the submission of false claims. A false claim would have resulted only if SAIC awarded further task orders to GW; Mr. Kaniewski thereafter replaced Mr. Lombardi without notice to SAIC and the State Department; Mr. Kaniewski submitted certifications to SAIC that either lacked authority or were falsely submitted under Mr. Lombardi's name; and Mr. Kaniewski submitted related claims for payment. These facts are not remotely alleged, and Mr. Lombardi admits that none of these events occurred. As far as the Complaint and the briefs reveal, Mr. Kaniewski inquired about the principal investigator role on the GATA subcontract, but never actually muscled into the position during Mr. Lombardi's tenure. In fact, since Mr. Kaniewski assumed the role of principal investigator in 2012, SAIC has not submitted any additional task orders to GW on the GATA subcontract. The pleadings do not explain the reasons for the internecine feud between Mr. Kaniewski and Mr. Lombardi, but the alleged facts provide no "objectively reasonable basis to believe" that Mr.

Lombardi reported actions that could have led to a viable FCA case. *See Hoyte*, 518 F.3d at 68. While Mr. Lombardi is entitled to the benefit of all reasonable inferences derived from the facts alleged, *see Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008), he offers no facts demonstrating that any of the factual predicates for an FCA case were likely to occur. Mr. Lombardi's theory that a series of hypothetical events *might* have resulted in the submission of false claims does not provide a reasonable basis for his allegations under the FCA. *See Yesudian*, 153 F.3d at 740.

Nor can Mr. Lombardi substantiate the reasonableness of his concerns by reference to the FEMA-NED subcontract. Mr. Lombardi concedes that "[t]he FEMA-NED incident does not give rise to protected activity," but contends that "it contributed to [his] reasonable belief that he was reporting fraudulent conduct with respect to GATA . . . ." Opp'n at 9 n.6. Yet Mr. Lombardi alleges that he was replaced as principal investigator on the FEMA-NED subcontract "just days *before* the submission deadline." Compl. ¶ 34 (emphasis added). Mr. Lombardi had no reason to believe that GW would deceive SAIC or the federal government based on GW's handling of the FEMA-NED subcontract. Instead, Mr. Lombardi had every indication that GW would inform SAIC of its subcontracting personnel before final submission of a task order. Accordingly, the FEMA-NED subcontract does not support the objective reasonableness of Mr. Lombardi's concerns with respect to the GATA contract. Because Mr. Lombardi has not plausibly alleged that he participated in protected activity, the Court will dismiss his Complaint for failure to state a claim.

## IV. CONCLUSION

While Mr. Lombardi alleges that Mr. Kaniewski planned to replace him as principal investigator on the GATA subcontract, Mr. Lombardi has not alleged an objectively

reasonable basis to believe that GW would have submitted a false claim or certification. Accordingly, the Court will grant GW's motion to dismiss for failure to state a claim. A memorializing Order accompanies this Opinion.


Date: September 11, 2014                                  /s/
                                          ROSEMARY M. COLLYER
                                          United States District Judge